**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

C. DAVID HUNT and
CAROL SANTANGELO,

        Plaintiffs,

                                Case No.

vs.

DONNELLY HADDEN and
DONNELLY W. HADDEN P.C.,

        Defendants

---

Michael C. Curhan (P36354)
Michael C. Curhan, Esq.
Attorney for Plaintiffs
3910 Telegraph Road, Suite 200
Bloomfield Hills, Michigan    48302
(248) 593-5000

---

## <u>COMPLAINT AND JURY DEMAND</u>

        Plaintiffs, C. David Hunt and Carol Santangelo, by their counsel, demand a JURY TRIAL and for their Complaint, state as follows:

### <u>Parties and Jurisdiction</u>

        1.      Plaintiff, C. David Hunt ("David") is a resident of Hoboken, New Jersey.

        2.      Plaintiff, Carol Santangelo ("Carol") is a resident of Hoboken, New Jersey.

        3.      Defendant, Donnelly Hadden is a resident of Ann Arbor, Michigan and is a lawyer and member of the State Bar of Michigan.

        4.      Defendant, Donnelly W. Hadden, P.C., is a Michigan professional corporation and, upon information and belief, has its principle place of business located in Washtenaw County, Michigan.

5.     The amount in controversy exceeds Seventy Five Thousand ($75,000) Dollars, exclusive of interest, costs and attorney fees, and the matter is otherwise within the jurisdiction of this Court   per 28 U.S.C.A. §1332.

### Background Facts

6.     In January 2007, David was a board certified neurosurgeon and was hired to perform neurosurgery at Marquette General Hospital in Marquette, Michigan.

7.     David's wife, Carol, temporarily remained back at their home in New Jersey while David became situated in Marquette.

8.     During this initial period, David leased a condominium located in Marquette.

9.     Within a few months after moving into this condominium, David began experiencing symptoms of cognitive deficit which interfered with his ability to function as a neurosurgeon.

10.     David's symptoms grew progressively worse.

11.     David started to experience memory problems, cognitive dysfunction and balance issues.

12.     On or about May 29, 2007, for the first time in David's surgical career, he felt so disoriented during an ongoing neurosurgical procedure, David remove himself from the operating room and called for a replacement so as not to harm the patient.

13.     This situation triggered a peer review investigation and a temporary suspension of David's surgical privileges at Marquette General Hospital.

14.     David was cooperative with the peer review investigation and the temporary suspension of his staff privileges despite the implications on his surgical career.

15.     David understood Marquette General Hospital needed to act in the best interests of its patients.

16.     In June 2007, when David's symptoms did not appear to be improving, he agreed to voluntarily resign from his well-compensated surgical position and he agreed to forfeit his staff privileges at Marquette General Hospital.

17.     Subsequently, in mid June 2007, David's sister came up from Ohio to assist David in packing up his personal effects and she noticed a chemical smell while in the condominium.

18.     This prompted David to investigate further and he subsequently learned the source of his debilitating injury.

19.     The condominium that he had leased was filled with toxic fumes.

20.     Shortly thereafter, David contacted Dr. Jeffrey Karr, the prior tenant in the condominium.

21.     Dr. Karr told David he also had suffered from "mental cloudiness" and fatigue while living in the condominium.

22.     Dr. Karr told David he installed, at his own expense, a special air ventilating system in the condominium to try to improve the air quality but, when this new venting system did not alleviate his symptoms, Dr. Karr terminated his lease and moved out of the condominium subsequently leased to David.

23.     Later, David learned the condominium, never received a final certificate of occupancy (COO) because the Marquette building inspector issued a building code violation specifically finding the water heater, fireplace and furnace intake vents and exhaust vents were located too closely to each other such that contaminated, toxic air that was supposed to be leaving the condominium through its exhaust vents instead was being re-circulated back into the condominium through nearby intake vents.

24.     To this day, David is permanently disabled and continues to suffer the effects of his toxicity exposure and has been unable to perform neurosurgery or otherwise practice as a treating physician.

### **Defendant Hadden's Legal Malpractice**

25.     On or about October 19, 2007, David and Carol hired Defendant Donnelly Hadden, Esq. and Donnelly W. Hadden, P.C. (collectively, "Defendant Hadden") as their legal counsel to pursue claims against all parties responsible for David's toxic exposure to indoor air contamination at his rented condominium in Marquette, Michigan.

26.     Defendant Hadden agreed to represent David and Carol pursuant to a contingency fee agreement which provided Defendant Hadden would receive as compensation for his legal representation one-third (1/3) of the net sum recovered for David and Carol after the deduction of the related incurred costs.

27.     In February 2009, Defendant Hadden filed a federal lawsuit against the owners of the condominium, Robert and Amy Armstrong ("the Armstrongs") and the condominium association, Harbor Ridge Townhouse Condominium Association ("the Condominium Association").   *Hunt v. Armstrong et al*, Case No. 2:09-cv-00038 ("Lawsuit I")

28.     In February 2010, the Condominium Association agreed to pay David and Carol $42,000 to settle their claims against the Condominium Association.

29.     In June 2010, the Armstrongs agreed to pay $21,000 to David and Carol to settle their claims against them.

30.     During the pendency of Lawsuit I, Defendant Hadden repeatedly told David that he planned to file a second lawsuit against other wrongdoers who appeared to be culpable for David's toxic exposure and resulting injuries.

31.     These other wrongdoers, according to Defendant Hadden included, without limitation, the following parties:

>   A.  Lower Harbor Properties LLC ("Lower Harbor"), the developer who, *inter alia*, never bothered to obtained a final COO due to health hazards associated with the venting problem and never bothered to correct and/or never appeared to have bothered to remove the health hazard before selling the condominium to the Armstrongs;
>
>   B.  Dressler Mechanical, Inc. ("Dressler"), the mechanical subcontractor who, *inter alia*, negligently installed the intake vents and exhaust vents for the water heater, fireplace and furnace too closely to each other such that contaminated, toxic air that was supposed to be leaving the condominium through its exhaust vents instead was being re-circulated back into the condominium through nearby intake vents or never appeared to have bothered to obtain a final COO and/or to have corrected this health hazard; and
>
>   C.  Swailes Plumbing & Heating, Inc. ("Swailes"), the installer who, *inter alia*, negligently recommended and/or negligently installed a Broan air filter and re-circulation unit in the condominium to improve the air quality and/or never appeared to have bothered to correct this health hazard.

32.     During the settlement negotiations with the Condominium Association and the Armstrongs, Defendant Hadden repeatedly advised David that the claims against the Condominium Association were weak (or words to that effect) and the Armstrongs appeared to be largely judgment-proof (or words to that effect).

33.     Conversely, during the settlement negotiations with the Condominium Association and the Armstrongs, Defendant Hadden repeatedly advised David the claims against Lower Harbor, Dressler and Swailes were strong for reasons, including, without limitation, (a) Lower Harbor's, Dressler's and Swailes' negligence were directly responsible for David's toxic exposure, and (b) each of these companies or entities would

have sizeable insurance policies and/or were more collectible than either the Condominium Association or the Armstrongs.

34.     Based on Defendant Hadden's advice and counsel, David and Carol agreed to accept the Armstrong's $21,000 settlement offer and the Condominium Association's $42,000 settlement offer and agreed to dismiss Lawsuit I.

35.     But Defendant Hadden's advice and counsel to David and Carol quickly took a turn for the worse.

36.     As part of the Armstrong settlement, the Armstrongs sent to Defendant Hadden a proposed settlement agreement in which the Armstrongs asked David and Carol to sign a "global" release providing David and Carol:

> release and forever discharge Robert Armstrong and Amy Armstrong **and any and all other persons, firms or corporations** charged or chargeable with responsibility of liability, their heirs, representatives, or assigns, **from <u>any and all claims</u>, demands, damages, costs, expenses, loss of services, actions or causes of actions <u>arising out of any act or occurrence</u> up to the present time** and particularly **<u>on account of all</u>** personal injury, disability, property damage, diminution in value, loss of **damages of any kind**, which have been sustained or that we may hereafter sustain **in consequence of the lease of a condominium unit and associated property located at 235 North Lakeshore Blvd, Marquette, Michigan**. (emphasis added)

37.     This broad, unambiguous language provided David and Carol were releasing, not only the Armstrongs, but also "any and all other persons, firms or corporations charged or chargeable with responsibility or liability."

38.     This broad, unambiguous language also provided David and Carol were releasing, everyone from "and all claims, demands, damages, costs, expenses, loss of

services, actions or causes of actions arising out of any act or occurrence up to the present time."

39.     Finally, this broad, unambiguous language provided David and Carol were "particularly" releasing, "all personal injury, disability, property damage, diminution in value, loss of damages of any kind" which David or Carol "sustained" (already or in the future) "in consequence of the condominium leased by David.

## Defendant Hadden's Ongoing Legal Malpractice and Fraud

40.     Without any carve-out provisions for claims Defendant Hadden told David and Carol would be filed against Lower Harbor, Dressler and Swailes (and possibly others), this release language barred any subsequently claim or lawsuit Defendant Hadden planned to file on behalf of David and Carol against Lower Harbor, Dressler, Swailes or anybody – particularly a claim or lawsuit for damages associated with David's toxicity exposure in consequence of the condominium he leased.

41.     Nevertheless, Defendant Hadden never advised David or Carol of the implications of signing such a broad release under Michigan law.

42.     Instead, Defendant Hadden assured David that the release would not in any way affect the subsequent lawsuit against Lower Harbor, Dressler, Swailes or others.

43.     Even after David specifically questioned Defendant Hadden about the whether the broad language in the release would bar the subsequent lawsuit against Lower Harbor, Dressler, Swailes or others, Defendant Hadden specifically re-assured David the release language used was "normal boilerplate" and would not affect Defendant Hadden's ability to sue Lower Harbor, Dressler, Swailes or others.

44. Thereafter, in June 2010, Defendant Hadden recommended David and Carol agree to hire another lawyer, Dr. Ernest Chiodo, as co-counsel to assist Defendant Hadden.

45. Defendant Hadden suggested Dr. Chiodo to serve as his co-counsel because Defendant Hadden told David and Carol he believed Lower Harbor, Dressler and/or Swailes would have large insurance policies and he anticipated "a much more vigorous defense than we met in Phase I."

46. On or about December 6, 2010, Defendant Hadden filed a state lawsuit in Marquette County Circuit Court against Lower Harbor, Dressler, and Swailes for their negligent acts in causing David's toxicity exposure to air contaminants. *Hunt v. Lower Harbor Properties LLC et al,* Case No *10-48615-NO* ("Lawsuit II")

47. Not surprisingly, Lower Harbor, Dressler and Swailes each answered the lawsuit by including as an affirmative defense that the broad language of the Armstrong release barred David's and Carol's claims against them.

48. Shortly after Lawsuit II commenced, Lower Harbor, Dressler and Swailes each filed a motion for summary disposition asserting that the broad language of the Armstrong release barred David's and Carol's claims against them.

49. Based upon information and belief, Dr. Chiodo declined to serve as Defendant Hadden's co-counsel based, in whole or in part, on the broad language of the Armstrong release.

50. On April 6, 2011, the trial court granted summary disposition in favor of Lower Harbor, Dressler and Swailes and explained, in detail, why the Armstrong release barred these claims against Lower Harbor, Dressler and Swailes.

51. This result was not surprising under the circumstances.

52.     By the time the Armstrong release was signed in 2010, Michigan law with respect to releases was quite settled in light of *Romska v. Opper,* 235 Mich App 512 (1999) and its progeny.

53.     For the 10+ years following the 1999 *Romska* decision, Michigan courts strictly enforced broad release language like the language used in the Armstrong release.

54.     Simply put, language like "any and all other persons" contained in the Armstrong release meant "everyone."

55.     If a party did not want to not include "everyone" in a release, the standard of care required the party's lawyer to specifically exclude those not to be included in the release.

56.     Nevertheless, thereafter, instead of acknowledging his malpractice, Defendant Hadden represented to David and Carol the trial court had committed reversible error and he advised or recommended David and Carol file an appeal with the Michigan Court of Appeals.

57.     On October 23, 2012, after full briefing and oral argument, the Michigan Court of Appeals unanimously rejected Defendant Hadden's appeal and specifically held, based on well-established Michigan law, that the broad release language used in Armstrong release barred David's and Carol's claims against Lower Harbor, Dressler and Swailes.

58.     Again, instead of acknowledging his malpractice, Defendant Hadden represented to David and Carol that the appellate court had committed error and advised or recommended to David and Carol file an application for leave to appeal to the Michigan Supreme Court.

59.    Defendant Hadden failed to advise David and Carol that it was highly unlikely the Michigan Supreme Court would grant this application for leave to appeal under these circumstances.

60.    Instead, Defendant Hadden chose to tell David and Carol:

> Have you made a decision about what to do with your case? The election results here were that one Democrat was elected to the Michigan Supreme Court but two Republican incumbents were re-elected.   The split is 4 GOP and 3 Dems, but one of the GOP (Brian Zahra) is considered at [sic] moderate, and is elected to fill out a term, so he has to run again in two years.   This may tend to keep him in the moderate camp at least until he feels secure.   He may be a "swing" vote and not always side with the two extreme right-wingers.   Obama carried Michigan nicely, and as Mr. Dooley said, "The Supreme Court Reads the Election Returns."   **There is an opening here because of the errors in Court of Appeals opinion I recited before**. (Emphasis added)

61.    Based on Defendant Hadden's advice and counsel, David authorized Defendant Hadden to file this application for leave to appeal.

62.    On November 30, 2012, Defendant Hadden filed an application for leave to appeal with the Michigan Supreme Court.

63.    On April 1, 2013, the Michigan Supreme Court issued its opinion denying Defendant Hadden's application for leave to appeal.

64.    On April 23, 2013, Defendant Hadden sent a letter to David and Carol stating he was "sorry and upset by the result" and he was closing his file in this matter.

### Defendant Hadden Misappropriates or Converts Settlement Proceeds

65.    On or about October 19, 2007, Defendant Hadden agreed to represent David and Carol pursuant to a contingency fee agreement by which Defendant Hadden would receive one-third (1/3) of the net sum recovered from the Armstrongs or any other

responsible parties concerning David's exposure to indoor air contamination at the condominium located at 235 Lakeshore Blvd, Marquette, Michigan.

66.     The contingency fee also provided David and Carol would be responsible for the costs incurred by Defendant Hadden in representing their best interests.

67.     In March 2010, Defendant Hadden received $42,000 from the Condominium Association's settlement with David and Carol.

68.     Upon information and belief, Defendant Hadden deposited this $42,000 into his client trust account.

69.     The costs incurred at that time, according to Defendant Hadden, totaled $13,087.76.

70.     At this stage, David and Carol had paid Defendant Hadden $11,500 to be applied to these costs and, after the Condominium Association settlement, were reimbursed by Defendant Hadden.

71.     Therefore, even assuming Defendant Hadden's representation of David and Carol concluded at this stage, Defendant Hadden's one-third (1/3) net attorney fee should have been $9,637.41 ($42,000 minus $13,087.76 divided by 3).

72.     Instead, Defendant Hadden paid himself $14,000 of the $42,000 from the Condominium Association settlement proceeds.

73.     Therefore, Defendant Hadden improperly embezzled or converted $4,362.59 ($14,000 - $9,637.41) for his own personal use from the Condominium Association settlement.

74.     Similarly, in June 2010, Defendant Hadden received $21,000 from the Armstrong's settlement with David and Carol.

75.    Upon information and belief, Defendant Hadden deposited this $21,000 into his client trust account.

76.    While holding this $21,000 in his client trust account, Defendant Hadden knew he was going to file Lawsuit II against Lower Harbor, Dressler, and Swailes for their negligent acts in causing David's toxic exposure to air contaminants and informed David and Carol of his intentions.

77.    While holding this $21,000 in his client trust account, Defendant Hadden understood he would incur additional costs on behalf of David and Carol in connection with his representing them in Lawsuit II.

78.    Nevertheless, in June 2010, Defendant Hadden improperly paid himself $7,000 of the $21,000 from the Armstrong settlement.

79.    Therefore, Defendant Hadden improperly embezzled or converted $7,000 for his own personal use from the Armstrong settlement.

80.    Upon information and belief, Defendant Hadden retained in his client trust account $14,000 ($21,000-$7,000) from the Armstrong settlement to be applied to costs associated with Lawsuit II.

81.    Upon information and belief, Defendant Hadden also still retained in his client trust account $14,912.24 [$42,000 minus $13,087.76 (costs) and minus $14,000 (Defendant Hadden's improper fee)] from the Condominium Association settlement to be applied to costs associated with Lawsuit II.

82.    Therefore, after Defendant Hadden paid himself $21,000 in fees and deducted $13,087.76 from the Condominium Association and Armstrong settlement proceeds, there should have been $28,912.24 ($14,000 +$14,912.24) remaining in

Defendant Hadden's client trust account and available to be applied to costs associated with Lawsuit II.

83.    Nevertheless, in October 2012, Defendant Hadden informed David and Carol there was only $10,657.76 remaining in his client trust account.

84.    Defendant Hadden never accounted, or provided any explanation, for what happened to the $18,254.48 ($28,912.24 – 10,657.76) of additional funds Defendant Hadden still should have been remaining in his client trust account from the Condominium Association and Armstrong settlements.

85.    In October 2012, after losing in the Michigan Court of Appeals in a unanimous decision based on the overbroad scope of the Armstrong release, Defendant Hadden told David and Carol he would file an application for leave to appeal to the Michigan Supreme Court as long as David and Carol agreed to retain him for a flat fee of $4,642 and the $425 filing fee.

86.    Defendant Hadden informed David and Carol he would deduct this $5,067 ($4,642 + $425) payment from the funds Defendant Hadden still held in his client trust account from the Condominium Association and Armstrong settlements.

87.    Based on Defendant Hadden's representations and omissions, David and Carol agreed to Defendant Hadden paying himself $5,067 from the funds Defendant Hadden still held in his client trust account from the Condominium Association and Armstrong settlements.

88.    On November 30, 2012, Defendant Hadden filed an application for leave to appeal to the Michigan Supreme Court and in April 2013, the Michigan Supreme Court denied Defendant Hadden's application for leave to appeal.

89.     On April 26, 2013, Defendant Hadden informed David and Carol he was "sorry and upset by the result" and sent them a check for $5,000 which he represented was the "unused balance" left in his client trust account.

90.     This $5,000 represents the total recovery David and Carol received from Defendant Hadden from the $63,000 received from the Condominium Association and Armstrong settlements.

91.     Defendant Hadden improperly embezzled or converted $25,642 ($14,000 + $7,000 + $4,642) in fees from the Condominium Association and Armstrong settlements.

92.     Upon information and belief, Defendant Hadden also improperly embezzled or converted at least $22,617.07 ($4,362.59 + $18,254.48) for his own personal use from the Condominium Association and Armstrong settlements.

### COUNT I
### LEGAL MALPRACTICE

93.     Plaintiffs incorporate their prior allegations.

94.     Plaintiffs retained Defendant Hadden.

95.     As counsel for Plaintiffs, under Michigan law, Defendant Hadden owed Plaintiffs certain duties including, without limitation, the following:

     A.     Exerting his best efforts wholeheartedly to advance Plaintiffs' legitimate interests with fidelity and diligence;

     B.     Acting in good faith;

     C.     Representing Plaintiffs' interests with reasonable care, skill and diligence; and

     D.     Maintaining attorney-client confidentiality.

96.     Defendant Hadden breached the duties owed to Plaintiffs in various ways including, without limitation, the following:

14

A.    Failing to undertake adequate discovery, or to act with reasonable diligence and promptness to complete discovery, in order to discover:

(1)    Complaints or reports of illness similar to David's complaints made to the Condominium Association, the Armstrongs, Lower Harbor, Dressler, Swailes, other third parties, governmental agencies, and/or any of their agents, such that any of these parties were, or should have been, on notice of the condominium's toxicity problem and informed David or remedied the problem prior to David's occupancy;

(2)    Complaints or reports of illness similar to David's complaints made by Dr. Jeffery Karr to the Condominium Association, the Armstrongs, Lower Harbor, Dressler, Swailes other third parties, governmental agencies, and/or any of their agents, such that any of these parties were, or should have been, on notice of the condominium's toxicity problem and/or informed David or remedied the problem prior to David's occupancy;

(3)    Complaints or reports of illness similar to David's complaints made by other owners or occupants of condominiums in the same development to the Condominium Association, the Armstrongs, Lower Harbor, Dressler, Swailes other third parties, governmental agencies, and/or any of their agents, such that any of these parties were, or should have been, on notice of the toxicity problem in the condominium leased by David and/or informed David or remedied the problem prior to David's occupancy;

(4)    Complaints or reports of illness made by Dr. Jeffery Karr to the Armstrongs, other third parties, and/or any of their agents, as to Dr. Karr's reason for terminating his lease and vacating the condom mum later leased to David

(5)    Subsequent complaints or reports of illness similar to David's complaints made to the Condominium Association, the Armstrongs, Lower Harbor, Dressler, Swailes, other third parties, governmental agencies, and/or any of their agents, and/or any remedies or remediations of other condominium units to cure or ameliorate the toxicity problem.

B.    Failing to adequately advise and protect Plaintiffs' interests by including, without limitation, inserting language in the Armstrong release:

15

(1)     Carving out or preserving Plaintiffs' ability to sue against Lower Harbor, Dressler, Swailes or others who may be responsible for David's toxic exposure and resulting damages; and

(2)     Providing the Armstrongs, or their agents, affirmatively represent they had no actual or constructive notice of the toxicity problem in the condominium before they leased it to David.

C.     Failing to adequately advise and protect Plaintiffs' interests by including, without limitation, inserting language in the Condominium Association release:

(1)     Carving out or preserving Plaintiffs' ability to sue against Lower Harbor, Dressler, Swailes or others who may be responsible for David's toxic exposure and resulting damages; and

(2)     Providing the Condominium Association affirmatively represents it, or its agents, had no actual or constructive notice of the toxicity problem in the condominium before they leased it to David.

D.     Failing to adequately advise and counsel Plaintiffs that the settlement agreements with the Armstrongs and/or the Condominium Association were unfair, inequitable and unreasonable under these circumstances;

E.     Failing to adequately advise and counsel Plaintiffs that they should reject the proposed Armstrong settlement agreement as it was originally drafted by Armstrong's counsel because the scope of the release was overbroad, unfair, inequitable and unreasonable under these circumstances;

F.     Failing to obtain Plaintiffs' informed consent as to the terms of the Armstrong release as Plaintiffs relied upon Defendant Hadden's (negligent) professional advice and counsel before signing the Armstrong release;

G.     Preventing Plaintiffs from making an informed decision whether to accept or reject the Armstrong and/or Condominium Association settlement agreements based on Defendant Hadden's (negligent) professional advice;

H.     Failing to adequately advise, or properly explain to, Plaintiff or preventing Plaintiff from making an informed decision whether to appeal the trial court's opinion regarding the scope of the Armstrong

16

release to the Michigan Court of Appeals or the Michigan Court of Appeals' unanimous opinion to the Michigan Supreme Court based on Defendant Hadden's (negligent) professional advice;

I.      Insisting Plaintiffs sign the Armstrong release based on Defendant Hadden's (negligent) professional advice and counsel as a properly informed and properly represented client would have rejected the settlement agreement without language protecting their ability to sue others for David's toxic exposure and resulting damages;

J.      Failing to adequately advise or properly explain to Plaintiffs that by signing the Armstrongs release, without language protecting their ability to sue others for David's toxic exposure and resulting damages, the Armstrong release would bar Plaintiffs from being able to sue others for David's toxic exposure and resulting damages; and

K.      Failing to adequately advise, or properly explain to, Plaintiff or preventing Plaintiff from making an informed decision whether to <u>not</u> settle with either the Armstrongs or the Condominium Association and, instead, to add to Lawsuit I all others to Lawsuit I, including Lower Harbor, Dressler and Swailes, so as to avoid an "empty chair" defense and/or to allow the defendants to seek to allocate fault among themselves.

97.      Defendant Hadden's breach of his professional obligations to Plaintiffs is a proximate, direct and legal cause of injury and damages to Plaintiffs.

## COUNT II
## BREACH OF FIDUCIARY DUTY

98.      Plaintiffs incorporate their prior allegations.

99.      As counsel for Plaintiffs, Defendant Hadden owed Plaintiffs certain fiduciary duties including, without limitation:

A.      Act with the utmost good faith;

B.      Render true and full information and not withhold information;

C.      Act in the best interests of Plaintiffs while subordinating one's personal interests to that of Plaintiffs;

D.      Not engage in self-dealing; and

E.      Other acts or omissions by Defendant Hadden against Plaintiffs as evidenced by the Michigan Rules of Professional Conduct.

17

100.  Defendant Hadden breached fiduciary duties owed to Plaintiff including, without limitation:

  A.  Not telling, or concealing from, Plaintiffs that Defendant Hadden had wrongfully converted or retained settlement proceeds owed to Plaintiffs;

  B.  Not telling, or concealing from, Plaintiffs that Michigan law provides the maximum allowable fee Defendant Hadden was allowed to recover from any settlement while representing Plaintiffs was one-third of the net amount recovered, after the deduction of costs; and/or

  C.  Not telling, or concealing from, Plaintiffs that Defendant Hadden had engaged in malpractice and/or the appeals to the Michigan Court of Appeals and the Michigan Supreme Court were likely to be futile and/or most likely a waste of time and money (or words to that effect).

**COUNT III**
**COMMON LAW CONVERSION**

101.  Plaintiffs incorporate their prior allegations.

102.  Defendant Donnelly W. Hadden P.C. an obligation to deliver or return specific money to David and Carol that Defendant Donnelly W. Hadden P.C. received from the settlements with the Condominium Association and the Armstrongs.

103.  These settlement funds were entrusted to Defendant Donnelly W. Hadden P.C.

104.  However, Defendant Donnelly W. Hadden P.C. wrongfully exerted dominion and control over portions settlement funds from Lawsuit I for his personal benefit.

105.  David and Carol have and/or will suffer damages as a direct and proximate result of Defendant Donnelly W. Hadden P.C.'s tortious misconduct.

## COUNT IV
## STATUTORY CONVERSION

106.    Plaintiffs incorporate their prior allegations.

107.    Defendant Donnelly Hadden, Esq. knowingly received, or aided in the concealment of, embezzled or converted property from Lawsuit I that belonged to David or Carol.

108.    David and Carol have and/or will suffer damages as a direct and proximate result of Defendant Donnelly Hadden, Esq.'s tortious misconduct.

## COUNT V
## UNJUST ENRICHMENT/RESTITUTION/FORFEITURE

109.    Plaintiffs incorporate their prior allegations.

110.    It is well established under Michigan law that a party has the equitable right of restitution when another party has been unjustly enriched at the expense of another. The remedy is one by which "the law sometimes indulges in the fiction of a quasi or constructive contract, with an implied obligation to pay for benefits received" to ensure that "'exact justice'" is obtained. *Michigan Educational  Employees Mut Ins. Co. v. Morris*, 460 Mich 180, 197-98 (1999).

111.    Defendant Hadden was unjustly enriched at the expense of David and Carol.

112.    Defendant Hadden benefited from his unfettered access to the settlement funds received from Lawsuit I.

113.    Defendant Hadden should be compelled to forfeit his attorney fees received in connection with his representation of David and Carol as an equitable remedy in addition to any other damages awarded to Plaintiffs.

114.    It is wholly inequitable, without compensating Plaintiffs, to allow Defendant Hadden to retain the settlement funds received from Lawsuit I and/or to profit personally under these circumstances.

## COUNT VII
## CONSTRUCTIVE TRUST

115.    Plaintiffs incorporate their prior allegations.

116.    Defendant Hadden, as Plaintiffs' counsel, is a fiduciary and is required to place Plaintiffs' interests before his own interests.

117.    Defendant Hadden, as Plaintiffs' counsel and fiduciary, is precluded from acting to benefit himself at Plaintiffs' expense.

118.    Defendant Hadden acted to enrich himself at Plaintiffs' expense and it would be inequitable to allow Defendant Hadden to retain any financial benefits as a result of his improper conduct.

119.    Defendant Hadden acted to deny, and divert from, Plaintiffs the benefit of the Lawsuit I settlement proceeds.

120.    It would be inequitable and unconscionable to allow Defendant Hadden to retain the benefits of his fraudulent misconduct.

121.    Equity requires the imposition of a constructive trust over all money Defendant Hadden derived from his fraudulent misconduct.

## COUNT VIII
## ACTUAL/CONSTRUCTIVE FRAUD

122.    Plaintiffs incorporate their prior allegations.

123.    Defendant Hadden made material representations to Plaintiffs including, without limitation, that:

20

A.   Defendant Hadden was entitled to or earned the $21,000 he took as his attorney fees from the settlement proceeds from Lawsuit I (or words to that effect);

B.   The release language used in the Armstrong release protected Plaintiffs' ability to sue others for David's toxic exposure and resulting damages (or words to that effect);

C.   The $21,000 Defendant Hadden took from the settlement proceeds from Lawsuit I was in accordance with his contingency fee agreement with Plaintiffs and Michigan law (or words to that effect);

D.   It was the trial court and appellate courts, and not Defendant Hadden, who committed error by their rulings that the Armstrong release did not prohibit Plaintiffs' ability to sue others for David's toxic exposure and resulting damages (or words to that effect); and/or

E.   Defendant Hadden's appeals to the Michigan Court of Appeals and the Michigan Supreme Court were likely to be successful and/or worth Plaintiffs' time and money (or words to that effect).

124.   These representations were false.

125.   When Defendant Hadden made these representations, he knew they were false or made them recklessly.

126.   Defendant Hadden made these representations with the intention that they should be acted upon by Plaintiffs.

127.   Plaintiffs acted in reliance upon these representations to their detriment and, *inter alia*, would never have signed the Armstrong release as drafted or spent additional time and money appealing Lawsuit II.

**COUNT IX**
**INNOCENT MISREPRESENTATION**

128.   Plaintiffs incorporate their prior allegations.

129.   Defendant Hadden made material representations to Plaintiffs including, without limitation, that:

A.   Defendant Hadden was entitled to, or earned, the $21,000 he took as his attorney fees from the settlement proceeds from Lawsuit I (or words to that effect);

B.   The release language used in the Armstrong release protected Plaintiffs' ability to sue others for David's toxic exposure and resulting damages (or words to that effect);

C.   The $21,000 Defendant Hadden took from the settlement proceeds from Lawsuit I was in accordance with his contingency fee agreement with Plaintiffs and Michigan law (or words to that effect);

D.   It was the trial court and appellate courts, and not Defendant Hadden, who had committed error by their rulings that the Armstrong release did not protect Plaintiffs' ability to sue others for David's toxic exposure and resulting damages (or words to that effect); and/or

E.   Defendant Hadden's appeals to the Michigan Court of Appeals and the Michigan Supreme Court were likely to be successful and/or worth Plaintiffs' time and money (or words to that effect).

130.   These representations were false.

131.   When Defendant Hadden made these representations, he knew they were false or made them recklessly.

132.   Defendant Hadden made these representations with the intention that they should be acted upon by Plaintiffs.

133.   Defendant Hadden benefitted from these representations in various ways including, without limitation, that:

A.   Defendant Hadden paid himself over $25,000 in fees;

B.   Defendant Hadden attempted to conceal his own malpractice;

C.   Defendant Hadden attempted to cover up his theft, conversion or embezzlement of a portion of the settlement proceeds of Lawsuit I that belonged to Plaintiffs; and

D.   Defendant Hadden paid himself $4,642 for attempting to cure his own malpractice by appealing Lawsuit II to the Michigan Supreme Court.

134.   Plaintiffs acted in reliance upon these representations to their detriment and, *inter alia*, would never have signed the Armstrong release as drafted or spent additional time and money appealing Lawsuit II.

## COUNT X
## SILENT FRAUD

135.   Plaintiffs incorporate their prior allegations.

136.   Defendant Hadden concealed material facts, which as Plaintiffs' counsel and fiduciary, he had a duty to disclose to Plaintiffs.

137.   These fraudulent concealments include, without limitation, the following:

   A.   Not telling, or concealing from, Plaintiffs that Defendant Hadden had wrongfully converted or retained settlement proceeds owed to Plaintiffs;

   B.   Not telling, or concealing from, Plaintiffs that Defendant Hadden failed to include language in the Armstrong release to protect Plaintiffs' ability to sue others for David's toxic exposure and resulting damages;

   C.   Not telling, or concealing from, Plaintiffs that Michigan law provides the maximum allowable fee Defendant Hadden was allowed to recover from any settlement while representing Plaintiffs was one-third of the net amount recovered, after the deduction of costs;

   D.   Not telling, or concealing from, Plaintiffs that Defendant Hadden engaged in various acts of malpractice; and/or

   E.   Not telling, or concealing from, Plaintiffs that Defendant Hadden's appeals to the Michigan Court of Appeals and the Michigan Supreme Court were likely to be futile and/or most likely a waste of time and money (or words to that effect).

138.   Defendant Hadden benefitted from these concealments in various ways including, without limitation, that:

   A.   Defendant Hadden paid himself over $25,000 in fees;

   B.   Defendant Hadden attempted to conceal his own malpractice;

23

C. Defendant Hadden attempted to cover up his theft, conversion or embezzlement of a portion of the settlement proceeds of Lawsuit I that belonged to Plaintiffs; and

D. Defendant Hadden paid himself $4,642 for attempting to cure his own malpractice by appealing Lawsuit II to the Michigan Supreme Court.

139. Plaintiffs acted in reliance upon these concealments and, *inter alia*, would never have signed the Armstrong release as drafted or spent additional time and money appealing Lawsuit II.

## COUNT XI
## LOSS OF CONSORTIUM

140. Plaintiffs incorporate their prior allegations.

141. Carol has suffered loss of consortium, i.e., marital companionship, society and services with her husband, David, due to Defendant Hadden's misconduct and malpractice.

WHEREFORE, Plaintiffs C. DAVID HUNT and CAROL SANTANGELO, requests that this Honorable Court enter an Order:

A. Awarding a money judgment against Defendants Donnelly Hadden and Donnelly W. Hadden P.C. in whatever amount the jury deems to be fair and reasonable;

B. Awarding treble damages plus costs and reasonable attorney fees due to Defendant Donnelly Hadden's statutory conversion violations as permitted under Michigan law;

C. Awarding exemplary and/or punitive damages against Defendants Donnelly Hadden and  Donnelly W. Hadden P.C. as permitted under Michigan or federal law;

D. Awarding pre-judgment and/or statutory interest and/or attorney fees against Defendants Donnelly Hadden and  Donnelly W. Hadden P.C. as permitted under Michigan or federal law;

E. Disgorging Defendants Donnelly Hadden and  Donnelly W. Hadden P.C. of all monies received as a result of their wrongful misconduct, fiduciary

breaches or tortious misconduct as permitted under Michigan or federal law; and

F.    Granting such other relief as this Court deems just or equitable under the facts and circumstances of this case.

Respectfully submitted,

MICHAEL C. CURHAN, ESQ.


By: /s/ Michael C. Curhan_____
Michael C. Curhan (P36354)
Attorney for Plaintiffs
3910 Telegraph Road, Suite 200
Bloomfield Hills, Michigan    48302
(248) 593-5000


Dated: February 14, 2014